SECOND DIVISION

NOVEMBER 5, 2002

No. 1-00-2749

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 99 CR 9231

)

WILLIAM BROWN, ) Honorable

) Fred G. Suria, Jr.,

Defendant-Appellant. ) Judge Presiding.

JUSTICE CERDA delivered the opinion of the court:

Defendant, William Brown, contends on appeal that the trial court abused its discretion in coercing the parties to use the mere-fact method of impeachment and that his 20-year sentence is excessive.

Defendant was
 charged in a four-count indictment with residential burglary, aggravated battery, and two counts of home invasion.  The residential burglary count was nol-prossed prior to trial.  Following a jury trial, defendant was found guilty of home invasion and aggravated battery.  The trial court merged the aggravated battery count and sentenced defendant to 20 years in prison for home invasion.  Upon finding that defendant’s actions caused the victim great bodily harm, the court noted defendant would be required to serve 85% of his sentence.

BACKGROUND

Prior to trial, defense counsel filed a motion 
in limine
 to exclude any evidence of defendant’s 1983 convictions for rape and armed robbery, for which he was sentenced to 20 years in prison.  The defense argued that introduction of the crimes would cause defendant extreme prejudice due to the similarity between the prior armed robbery and the current home invasion charges.  The State responded that pursuant to 
People v. Montgomery
, 47 Ill. 2d 510 (1971), it was entitled to introduce defendant’s prior crimes to impeach his credibility should he choose to testify at trial.  The trial court found that, if defendant testified, the State would be entitled to reveal the fact that defendant received a felony conviction in 1983, but could not expose the nature of the crimes.  The court specifically stated:

“This has been revisited within the last year and a half by the Supreme Court of Illinois. Unfortunately, in my judgment, they have said that if there is to be use of a prior conviction for the purpose of credibility only, that the basis of a conviction must be mentioned.  I had always felt -- and where the Defendant asked not to have the nature of the charge revealed, I would not reveal it.  Simply that there was a conviction in such-and-such a year, and that would be it.  Unfortunately, the Supreme Court, in a divided opinion, indicated that should not occur.  The crime itself should be shown.

And we come to the second question, does it meet all the parameters of Montgomery.  As you pointed out, Mr. Bellendir, it does.  That means the last question for the Court, as to whether or not the probative value outweighs the prejudicial value -- at this point in time I don’t know if the Defendant’s going to be testifying or not and whether or not it’s going to be an issue of credibility or whether or not it’s an issue of fact that both sides agree on and whether or not those facts constitute a violation of the law as alleged by the State.

* * *

I would do this: If a defendant can give up his right, constitutional right to trial by jury, or constitutional right to remain silent, or constitutional right to have counsel, it seems to me that he ought to be able to give up the right as to whether or not if I permit the use of a prior felony and I eliminate the nature of the charge, accordingly, therefore, if your client -- I will be permitting the State to use the prior conviction.  It is appropriate.  They are entitled by case law.  It does meet all the criteria set forth in the prior case.  And if the Defendant requests that I not include the nature of the charge, over the State’s vehement objection, I will not allow them to do so.  I will allow them just to show that there was a conviction on such-and-such a date.

* * *

Mr. Brown, understanding I will be allowing the State to use the prior conviction, if you request it, I will deny the State their right to use the nature of the crime.

DEFENDANT BROWN: Yes, absolutely.”

Following jury selection, the court clarified its position, stating:

“[Defendant’s 1983 conviction] does fall within the ambit of the Montgomery decision.  The issue therefore for the Court to decide is whether or not the prejudicial effect outweighs the probative value.  In this case I am advised, although I don’t know what the facts are or the allegations other than what the stark allegations are, there will be an issue of credibility that it would be appropriate for the State to use that to challenge the credibility of the defendant if he sees fit to take the stand based upon the Montgomery rule.

However, if I follow the Supreme Court rule [
sic
] opinion which means that the nature of the offense should also be indicated to the jury I would be weighing that and find that the prejudicial value would outweigh the probative effect.

I will however if there’s an agreement between the parties I will allow it for the purpose of credibility only if the State sees fit to offer just the fact that it’s a felony conviction.  Otherwise I’ll exercise my judgment and find that the prejudicial value outweighs the probative value.

So I need an answer from the State as to how they wish to handle it.

MS. LANAHAN: Judge, the State will -- if the defendant chooses to testify the State will offer the conviction without the *** offense being named.

THE COURT: And my reason for doing it was as I stated before I believe it’s within the State’s province to indicate where there is an issue of credibility there has been a felony conviction.  He is not a middle-aged defendant who has no prior record.

On the other hand, the prejudicial effect of indicating the nature of the offense of which we speak in my judgment would outweigh the probative value and that’s the reason I would be denying it if the State insisted on showing the nature of the offense.

Since they’re agreeing not to do so I would permit the State to use the prior conviction in the event the defendant takes the stand as simply a felony conviction for the purpose of credibility only.

MS. LANAHAN: Judge, so the record is clear the State feels it’s well within their right to use the conviction as well as the offense charged, but based on Your Honor’s ruling we will abide by just giving the conviction without naming it.”

At trial, Corliss Garrett testified that she lived in apartment 608 at 1246 West Pratt Avenue in Chicago.  Around 7:30 p.m. on March 12, 1999, she was in her apartment and heard loud music and noise coming from the apartment directly above her.  Garrett went upstairs to ask the neighbors, one of whom she knew as Luis, to be more quiet.  Luis and his roommate denied there was any noise coming from their apartment.  Garrett returned to her apartment, but the noise continued.  She went back upstairs and told the occupants she would call the police if they did not stop banging and turn down their music.

As Garrett was talking to Luis, defendant approached them and introduced himself as Chuck Brown.  He told them he was the new chief security officer in the building.  He then explained that instead of complaining to her neighbor, Garrett had to speak with the landlord or fill out a complaint form.  Defendant told her to go back to her apartment and he would bring her a complaint form.

Garrett testified that she went back to her apartment and left the door open for defendant.  When defendant arrived, he stood in the doorway and told Garrett he would have to return later because he did not have a form with him at that time.  After defendant left, Garrett went to sleep.

Garrett was awakened some time later by a knock on her door.  When she opened the door, defendant gave her a form and a pen.  Garrett put the form on her kitchen counter and began to fill it out.  As defendant explained the form to her, Garrett noticed the form read “position applied for.”  As she looked up to tell defendant it was the wrong form, she saw a 12-inch butcher knife in his hand.  Garrett testified that defendant grabbed her and covered her mouth with his hand.  A struggle ensued, during which defendant’s hand slipped down from Garrett’s mouth and he grabbed her around the neck.  Garrett struggled as defendant swung the knife at her.  After the knife blade scratched her face, Garrett jerked free of defendant’s grasp causing defendant’s fingers to burn her neck.  Garrett then stabbed defendant in the face with his pen.

Garrett attempted to run, but fell backwards.  Defendant grabbed her hair and swung the knife at her.  He told her that if she did not stop screaming and kicking he would kill her.  Garrett testified that she continued to scream and kick, and defendant cut her ankle with the knife.  He asked her where her money was, but she told him she did not have any and to get out of her house.

Garrett continued to back up, while kicking defendant and falling down.  She testified that defendant stabbed her ankle a couple more times.  She then fell at the legs of a table and felt a sting in the back of her shoulder.  She later determined that defendant had stabbed her.  As defendant grabbed Garrett by the hair and brought the knife down again, she grabbed the knife by the blade.  Defendant cut her hand as he pulled the knife away.

Garrett stated she then pushed defendant and ran out of the apartment.  She ran down the hall and pounded on a neighbor’s door, screaming that someone was trying to kill her.  Garrett saw defendant appear in her doorway and run to the stairs, which led to the exit.  Garrett testified that the incident lasted 5 to 10 minutes and the front door to her apartment was open the entire time.

After the police arrived, an ambulance took Garrett to the hospital between 2 a.m. and 3 a.m.  She testified that she received two stitches in her back and two stitches in her hand.  Hospital personnel also cleaned and dressed wounds on her leg, face and neck.  The State introduced pictures, taken by Garrett’s mother, of the wounds on Garrett’s neck, shoulder, ankle and hands.

When Garrett returned to the apartment building that morning, she met the landlord, the landlord’s son and defendant’s girlfriend, Faith Ridley, in the lobby.  Garrett testified that she took Ridley to her apartment and showed her where the attack occurred.  Garrett gave Ridley defendant’s hat, the piece of paper and the pen, which she stated had a broken tip and defendant’s flesh on it.  Garrett testified that the police who arrived immediately after the incident told her they did not need the evidence.

Garrett stated that on March 15, 1999, Chicago police officer Leavitt went to her apartment and had her identify defendant from a photo array.  Subsequently, Sergeant Schoeber also went to her home and sent technicians there to gather evidence.  Garrett told Schoeber that she gave the hat, pen and paper to Ridley.  The technicians took the dress Garrett was wearing the night of the incident and a piece of carpet that had blood on it.  Garrett testified that the dress had a cut in the shoulder where defendant stabbed her, but no blood because she had washed it.

Garrett admitted on cross-examination that she suffered from depression.  She was taking Dioxipin and Syresol on an as-needed basis at the time of the incident.  She also stated that she had seen defendant standing in front of the building once, but they had never spoken to each other.

Luis Sagastume then testified that on March 12, 1999, he lived at 1246 West Pratt Avenue in Chicago.  Around 8 p.m. or 8:30 p.m., he and his roommate were rearranging furniture and playing music when Garrett knocked on their door.  Garrett stated she lived downstairs and complained that Luis and his roommate were making too much noise.  Luis told Garrett he would turn the music down.  Garrett left, but returned a second time to complain about the noise.

Luis testified that while he was speaking to Garrett the second time, defendant approached them and identified himself as a security guard for the building.  Luis had seen defendant once before on the day he moved into the building.  Defendant told Garrett to leave and he would take care of the problem.  Defendant had a short conversation with Luis and his roommate, then left.

The parties stipulated that, if called, Joyce Steele would testify she lived at 1246 West Pratt Avenue.  In the early morning hours of March 13, 1999, Steele heard screaming and yelling in the hallway.  She then heard someone pounding on her door screaming for help.

Officer Leavitt testified that on March 15, 1999, he and his partner went to Garrett’s home and showed her a photo array.  Garrett identified a picture of defendant as the man who attacked her.

Sergeant Joseph Schoeber testified that he was assigned to investigate an attempted armed robbery, which occurred on March 13, 1999.  On March 20, 1999, he spoke with Garrett at her home.  He had an evidence technician collect a piece of Garrett’s carpeting which bore reddish-brown stains, as well as the dress Garrett wore the night of the incident. 

After Garrett told Schoeber that Ridley was in possession of further evidence, Schoeber contacted Ridley at her place of employment.  Ridley signed a consent form for police to search  the apartment she shared with defendant and gave the sergeant her keys.  During the search, Schoeber found the hat Garrett had given to Ridley.  He also found a note on the counter, which read, “number 708.  Lady in 608 says music too loud.  Wants to call police.  3-11-99. /Chuck/.”  Schoeber testified that there was a wooden block on the kitchen counter, which held a set of knives, but one of the knives was missing.  Schoeber never located the knife used to stab Garrett or the pen with which Garrett stabbed defendant’s face.

On April 6, 1999, Schoeber received information that defendant was at the police station.  Schoeber spoke with defendant and testified at trial that he saw scars on defendant’s hands and chin at the time.

Evidence technician Arthur Oswald testified that he photographed Garrett’s apartment, the dress she wore the night of the incident, and the stain on the carpet.  Oswald recalled that Garrett’s dress was cut, but showed no blood.  Garrett told him she had washed the dress.

Faith Ridley testified that, at the time of trial, she was defendant’s girlfriend and had known him for three years.  On March 12, 1999, she and defendant were living together in apartment 707 at 1246 West Pratt Avenue in Chicago.  Defendant was rehabilitating apartments in the building and was also working as a security guard.  On that day, Ridley spoke with defendant around 8 p.m. or 9 p.m.  He was working security and Ridley stated she went downstairs to tell him there was a disturbance on their floor.  Defendant did not return home that night or the next day, but Ridley later saw him at his cousin’s house.  She stated they both knew the police were looking for defendant.  Ridley subsequently saw defendant around April 3, 1999, in Minneapolis.  He asked her to join him there and bring him a bus ticket to Chicago.  Ridley testified defendant wanted to return to Chicago and surrender to the police.

Ridley was recalled to testify for the defense.  She stated that defendant left their apartment around 6 p.m. on March 12, 1999.  He later returned, and they talked.  Ridley then fell asleep and was awakened the next morning by the police.  The police said they were looking for defendant and searched the apartment without her consent.  Ridley testified that the set of knives in the butcher block described by Sergeant Schoeber was never a complete set.

When Ridley saw Garrett in the hallway on the morning of March 13, 1999, Garrett was wearing a hospital gown.  Garrett told Ridley she might have some of her things.  Ridley went to Garrett’s apartment and Garrett told her she had gotten some bad drugs from defendant and wanted Ridley to pay her back for them.  Ridley told Garrett she did not have any money.  Garrett subsequently gave her a hat that belonged to defendant, a clipboard, and a pen.  Ridley testified that the pen was not broken and did not have blood on it.

Ridley further testified that on March 22, 1999, Sergeant Schoeber spoke with her at her work.  Schoeber asked her some questions, then told her he needed her consent to search her apartment.  Ridley stated that when she hesitated, the sergeant told her he would get a warrant if she did not consent.  As a result, she signed the consent form and gave him her keys.  She also testified she told the sergeant that the altercation between defendant and Garrett was about drugs and that the knife set had never been complete.  Ridley admitted that the next time she saw defendant, he had a “big gouge” in his face.

Defendant testified that on March 12, 1999, he lived at 1246 West Pratt Avenue in Chicago, apartment 707.  At that time, he had been working maintenance and security in the apartment building for two months.  Around 8 p.m. on March 12, 1999, defendant heard Garrett and two men shouting at each other in the hallway.  Defendant went into the hallway and asked what the altercation was about.  As the men told defendant what was happening, they and Garrett shouted obscenities at each other.  Defendant testified that he asked Garrett to go downstairs because he was concerned for her safety. 

After speaking with the men, defendant went to Garrett’s apartment and told her he would report the incident to the landlord in the morning.  Defendant and Garrett then talked for awhile, and Garrett asked defendant if he “smoked” or “got high.”  Defendant responded that he did get high sometimes.  The two proceeded to smoke some crack cocaine.  When they finished, Garrett asked defendant if he would go buy more and he agreed.  Garrett gave defendant $35 and he purchased some crack cocaine on Morse Avenue.  When defendant returned to Garrett’s apartment, they smoked it together.  Garrett again asked defendant if he would get more drugs and defendant again agreed.  He took $65 from Garrett and went back to Morse Avenue.

After seeing a police car on the corner, defendant returned to the building without making a purchase.  Defendant testified that he tried to give Garrett her money, but she became upset that he did not purchase any drugs.  Defendant stated that Garrett hit him in the chin with an object and he pushed her away.  The two began to struggle over defendant’s key ring.  After defendant gained possession of his keys, Garrett hit and kicked him.  Defendant stated he backed into the hallway while cursing at her.  According to defendant, the incident lasted 5 to 10 minutes and occurred in Garrett’s doorway.

Defendant testified that after he left the apartment, he saw Garrett running toward him with her arm in the air.  He ran through a side doorway to get away from her and left the building.  Defendant went to a bar on Morse Avenue and did not return home that night because he realized he “had been cut.”  He testified that he was afraid the police would not treat him fairly after the incident with Garrett, however, he also stated he did not know Garrett was injured until Ridley later informed him of her injuries.  

Defendant went to stay at a cousin’s home and subsequently fled to Minnesota.  Defendant stated he later surrendered himself to the police because it was the right thing to do and he had done nothing wrong.  He asserted that he did not have a knife when he went to Garrett’s apartment and he never stabbed her.  He also said that Garrett received the cut on her hand when he pulled his keys away from her.

In rebuttal, the State informed the jury that defendant was convicted of a felony in 1983.  The State also recalled Sergeant Schoeber, who testified that he spoke to Ridley on March 22, 1999, and she did not tell him the altercation was about drugs or that Garrett had asked her for money.

Garrett also testified in rebuttal that she did not invite defendant into her apartment on March 12, 1999, nor did she smoke crack or own a crack pipe.  She had been sober for five years at the time the incident occurred.  Garrett stated she never asked Ridley for money, but she told Ridley defendant had attacked her.  Because Ridley did not believe her, she took Ridley to her apartment to show her defendant’s belongings.

The jury found defendant guilty of home invasion and aggravated battery.  At sentencing, the trial court stated it considered the facts of the case, defendant’s background, the presentence investigation, and his potential for rehabilitation.  The court specifically noted defendant’s 1983 conviction for rape, deviate sexual assault and armed robbery.  The court sentenced defendant to 20 years in prison for home invasion and merged the aggravated battery count.  The court found that defendant did cause great bodily harm to the victim and, therefore, would be required to serve 85% of his sentence.

ANALYSIS

Defendant first contends that the trial court abused its discretion when it “induced” the parties to accept the mere-fact method of impeachment, instead of ruling on defendant’s motion 
in limine
.  
The State argues that this issue has been waived because 
defendant
 did not object to the use of mere-fact impeachment at trial, nor did he raise it in his posttrial motion.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

The State may not introduce evidence of a defendant’s prior convictions only to show his propensity to commit crimes.  
People v. Robinson
, 299 
Ill. App. 3d 
426, 440, 701 
N.E.2d
 231 (1998).  However, evidence of a prior conviction is admissible to attack a witness’ credibility if: (1) less than 10 years have elapsed since the date of the prior conviction or the date of release, whichever was later; (2)
 
the prior crime is punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment; and (3) the probative value of the evidence of the prior crime outweighs the danger of unfair prejudice
.  
People v. Atkinson
, 186 Ill. 2d 450, 456, 713 N.E.2d 532
 (1999); 
People v. Montgomery
, 47 Ill. 2d 510, 516, 268 N.E.2d 695 (1971)
.

In balancing the probative value
 of using a prior conviction against the danger of unfair prejudice, the trial court should consider “the nature of the prior conviction, its recency and similarity to the present charge, other circumstances surrounding the prior conviction, and the length of the witness’ criminal record.”  
Atkinson
, 186 Ill. 2d at 456.  If the court finds that the prejudice substantially outweighs the probative value, evidence of a defendant’s prior crimes may not be used to impeach his testimony at trial.  
Atkinson
, 186 Ill. 2d at 456.

In the mere-fact method of impeachment
, the jury is only informed that the defendant has been convicted of felony in a certain year, not the nature of the crime.  
Atkinson
, 186 Ill. 2d at 457.
  “[T]he jury learns only of the fact that the witness committed a past crime, not the name of the offense.”  
Atkinson
, 186 Ill. 2d at 457.
  

In 
People v. Atkinson
,
 the Illinois Supreme Court rejected the mere-fact method of impeachment and reaffirmed the use of the 
Montgomery
 test in Illinois courts.  The court found that “it is the nature of a past conviction, not merely the fact of it, that aids the jury in assessing a witness’ credibility.”  
Atkinson
, 186 Ill. 2d at 458.  
Accordingly, the mere-fact method undermined the purpose of the 
Montgomery
 test and inhibited the jury’s evaluation of a defendant’s credibility.  
Atkinson
, 186 Ill. 2d at 458.  The court further added that mere-fact impeachment could prejudice a defendant because a jury may speculate that the prior crime is more serious than the one of which defendant was actually convicted.  Therefore, the trial court must conduct the 
Montgomery
 test, balancing the defendant’s interest in unfair prejudice against the State and jury’s interest in a defendant’s veracity, and either bar or allow the use of a prior crime, including the name of the offense, on that basis.  
Atkinson
, 186 Ill. 2d at 458.
  

In this case, defendant brought a motion 
in limine
 to bar the introduction of his prior crimes.  The State argued that the 
Montgomery
 factors had been met and defendant’s prior crimes were admissible for impeachment purposes if defendant testified.  The trial court properly found that defendant’s prior conviction met the first two prongs of the 
Montgomery
 test -- defendant had been released from prison less than 10 years prior to the commission of the current crime and the prior crime was punishable by imprisonment in excess of one year.  However, in balancing the prejudice to defendant and the probative value of introducing the prior crime, the court found that 
the prejudice of introducing the prior conviction would outweigh the probative value if the nature of the crime were revealed.  The court determined that defendant could waive his right to have the nature of the crime revealed, just as he could waive his right to remain silent and his right to an attorney.  Therefore, the court permitted the State to use only the mere-fact method of impeachment.  

Although the 
Atkinson
 court noted that one problem with the mere-fact method of impeachment was that it might prejudice a defendant, it also determined that the method undermined the overall purpose of the 
Montgomery
 test.  As a result, the supreme court directed the trial courts to not even consider the mere-fact method of impeachment.  
Atkinson
, 186 Ill. 2d at 461.  In 
People v. Cox
, 195 Ill. 2d 378, 748 N.E.2d 166 (2001), the supreme court reaffirmed this position
, stating that
 use of the mere-fact method of impeachment was not up to the trial courts’ discretion; the courts should 
not consider the method at all.  Accordingly, the trial court erred when it allowed the use of the mere-fact method of impeachment at defendant’s trial.  See 
Cox
, 195 Ill. 2d at 386-87.

Despite the fact that defendant waived this issue by
 failing to object to the use of mere-fact impeachment at trial and by failing to raise it in a posttrial motion,
 we will 
consider his argument under the plain error doctrine.  
Enoch
, 122 Ill. 2d at 186.
 
 Plain error occurs when a defendant is denied a fair trial or in a trial where the evidence is closely balanced.  134 Ill. 2d R. 615(a); 
People v. Lusietto
, 316 Ill. App. 3d 143, 145, 736 N.E.2d 689 (2000).  
We find that plain error occurred in this case as the evidence was closely balanced.

Defendant’s conviction was dependent on the credibility of the witnesses.  Garrett testified that defendant entered her apartment under the pretense of bringing her a complaint form.  Once he was there, he wielded a 12-inch knife, attacked her, and stabbed her in the ankle, shoulder and hand.  Defendant testified that he went to Garrett’s apartment to inform her that he would report her incident to the landlord.  While he was there, Garrett asked him if he wanted to do drugs with her.  Defendant stated that Garrett attacked him, after they smoked some crack cocaine
.  According to defendant, he defended himself by pushing Garrett away and her hand was cut when he grabbed his keys from her.

There were no other eyewitnesses to the actual incident, the police did not recover a knife from the scene, no medical reports were introduced regarding Garrett’s or defendant’s injuries, and no physical evidence substantially supporting either version of events was presented at trial.  Garrett testified the police told her they did not need the pen she used to stab defendant, the dress she was wearing the night of the incident, defendant’s hat or defendant’s clipboard.  The scene of the crime was not secured and evidence was either discarded or given away.  Finally, no test results regarding the reddish-brown stain on the carpet were introduced at trial.  Defendant was convicted primarily because the jury believed Garrett’s testimony over his.

Because this case rested on the credibility of the witnesses, the erroneous use of mere-fact impeachment could have affected the outcome of the trial.  Were defendant’s prior conviction not introduced to impeach his testimony, the jury may have chosen to believe his version of events.

The State argues that defendant and his attorney agreed to the use of mere-fact impeachment and, therefore, cannot challenge its use on appeal.  See 
People v. Lowe
, 153 Ill. 2d 195, 199, 606 N.E.2d 1167 (1992)
.  Where "'a defendant *** invites *** the admission of evidence, even though it be improper, he cannot complain.'"  
People v. Payne
, 98 Ill. 2d 45, 50, 456 N.E.2d 44 (1983), quoting 
People v. Burage
, 23 Ill. 2d 280, 283, 178 N.E.2d 389 (1961).  However, defendant in this case did not invite the admission of his prior convictions.

According to the record, the trial court told defendant, “Mr. Brown, understanding I will be allowing the State to use the prior conviction, if you request it, I will deny the State their right to use the nature of the crime.”  Defendant then requested that the nature of his prior crimes not be revealed to the jury.  Because the court had already decided to admit defendant’s prior crimes, defendant’s subsequent “request” not to have the nature of the crime revealed did not amount to an agreement to use the mere-fact method of impeachment.  It was clear to defendant that his motion not to be impeached with his prior crimes had been denied.  While defendant agreed to the method of impeachment, he did not agree to be impeached.  
Defendant did not
 waive his right not to be impeached
, nor did he invite
 the error
.

Furthermore, after jury selection, the court revisited the issue and came to the opposite conclusion.  It stated that the prejudicial effect of introducing the nature of the crime to the jury outweighed the probative value, and, if the State insisted on revealing the nature of the offense, it would deny introduction of the prior crime.  The court further stated that because the State agreed not to reveal the nature of the prior conviction, it would allow the mere-fact of the conviction to impeach defendant’s credibility.  The State responded that it had not agreed to the mere-fact method, but would only introduce the fact of the prior crime due to the court’s prior ruling.  Given this confusion and the court’s method of reaching an “agreement” between the parties, we find the parties did not actually agree to use of the mere-fact method.  Rather, the trial court abused its discretion by not properly employing the 
Montgomery
 test.  
Montgomery
, 47 Ill. 2d at 517-18.

Finally, the State argues defendant was not prejudiced by the court’s error.  Instead, it was to defendant’s benefit that only the fact of his prior conviction was disclosed, and not the nature of the crime.  We disagree.  After properly weighing the prejudice and probative value of introducing defendant’s prior crimes, the court could have barred any use of the crime at all.  In fact, the trial court stated at one point
 that, if the nature of defendant’s prior crimes were revealed, the prejudice to defendant would outweigh the probative value.  If that was the case, no evidence of defendant’s prior crimes should have been introduced at trial pursuant to the 
Montgomery
 test.  Because the credibility of defendant’s testimony was a key factor in his conviction, erroneously introducing the mere-fact of a prior conviction could have been a material factor in the jury’s decision.  
Although the evidence was not overwhelming, it "suffices to permit retrial without offending double jeopardy."  
People v. Peete
, 318 Ill. App. 3d 961, 972, 743 N.E.2d 689 (2001).
  As a result, we remand the cause of action for a new trial.  See 
Cox
, 195 Ill. 2d at 392.

Because the cause of action is remanded, we need not address defendant’s contention that his 20-year sentence was excessive.

Accordingly, the judgment of the circuit court is reversed and the cause remanded for a new trial.

Reversed and remanded.

CAHILL and BURKE, JJ., concur.